UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY L. GAMBLE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JO ANNE B. BARNHART,<br><br>　　　　Defendant.<br>_____/ | No. C-05-3689 JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND/OR REMAND AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Docket Nos. 13, 16]** |

## I.　INTRODUCTION

Plaintiff, Terry L. Gamble, filed a complaint on September 13, 2005, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits under Title II of the Social Security Act. Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, or in the alternative, for an order remanding the matter for further administrative proceedings.

Plaintiff applied for disability benefits on December 27, 2002, alleging an onset date of January 2, 2002. The application was denied initially and on reconsideration. Plaintiff made a timely request for a hearing, which was held on September 15, 2004, before an Administrative Law Judge ("ALJ") in Oakland, California. At the hearing, testimony was taken from Plaintiff and the Plaintiff's father-in-law, Mr. Michael Henry. Gerald D. Belchick, Ph.D., testified as a vocational expert. Plaintiff was represented by counsel at the hearing. On December 16, 2004, the ALJ issued a decision finding Plaintiff was not disabled as defined in the Social Security Act, and denying his request for benefits. This decision became final when the Appeals Council declined to review the ALJ's decision on July 11, 2005.

Plaintiff filed a Motion for Summary Judgment on March 15, 2006, and the Commissioner filed a Cross-Motion for Summary Judgment on April 17, 2006. Plaintiff filed his Reply brief on May 4, 2006. The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

**II.    BACKGROUND**

    **A.    Plaintiff's Background**

Plaintiff was 38 years old as of the alleged onset date of his disability, January 2, 2002. Administrative Record ("AR") at 44 (date of birth June 2, 1963), 72 (onset of disability January 2, 2002). He completed high school and attended junior college for three years. AR at 88, 397. From June 1981 until January 2002, Plaintiff worked as a lather in the construction industry. AR at 94-95. Plaintiff also spent two days a month working as a firefighter in the U.S. Army Reserves from February 1988 through February 1994. AR at 94, 96. In addition, he worked as a door-to-door salesman selling Kirby vacuum cleaners between January 1991 and July 1994. *Id.*

    **B.    Plaintiff's First Injury**

On September 4, 2001, while working as a lather, Plaintiff crossed a scaffolding with his hard hat on and struck his head against a cross bar, jamming his neck. AR at 150. He took one day off and then returned to work. *Id.* As a result of the injury, Plaintiff suffered from "fairly severe" neck stiffness and experienced pain radiating throughout his right arm and shoulder. *Id.* On September 14, 2001, Plaintiff sought treatment from Robert C. Dees, D.C., a chiropractor. AR at 257. Dr. Dees diagnosed Plaintiff's injury as brachial neuritis/radiculitis and a cervical sprain/strain and recommended chiropractic therapy and shoulder strengthening exercises. AR at 257. On December 5, 2001, Plaintiff consulted with Desmond Erasmus, M.D., a neurosurgeon, for treatment of his injury. AR at 150. Because Plaintiff was still experiencing intense pain, Dr. Erasmus concluded that Plaintiff's chiropractic treatment had not been successful. AR at 151. He recommended an MRI to determine whether Plaintiff had a cervical disc herniation and suggested, in the alternative, that Plaintiff might have cervical radiculitis. *Id.*

On December 8, 2001, Charles Fiske, M.D., performed an MRI on Plaintiff's cervical spine. AR at 147. In his report, Dr. Fiske concluded that Plaintiff's C2-3, C3-4, C4-5 and C6-7 discs were

normal. *Id.* However, Dr. Fiske found that Plaintiff's C5-6 disc was narrowed and degenerative and that there was endplate spurring with annular bulging. *Id.* Dr. Fiske concluded that Plaintiff suffered from C5-6 spondylosis with right neural foraminal stenosis, but he found no evidence of disc herniation. *Id.*

Still suffering from right neck, arm, and shoulder pain, Plaintiff stopped work completely on January 2, 2002. AR at 150, 146. On that date, Dr. Erasmus diagnosed Plaintiff with cervical disc protrusion/spondylosis and cervical radiculitis. AR at 146. Dr. Erasmus advised Plaintiff of the benefits and risks of surgical intervention, and Plaintiff opted to stay on a nonsurgical treatment plan. AR at 138. During a subsequent visit to Dr. Erasmus, on March 6, 2002, Plaintiff stated that he continued to experience pain in his cervical area with radiation into the right upper arm and shoulder, as well as numbness in his right hand. AR at 139. Plaintiff and Dr. Erasmus discussed the possibility of minimally invasive cervical surgery, and Dr. Erasmus recommended that Plaintiff consult with Stanton Schiffer, M.D., a neurosurgeon locally "renowned" for the practice of minimally invasive surgery on the cervical and lumbar spine. *Id.* In a March 29, 2002 report, Dr. Erasmus described Plaintiff's diagnosis as a cervical disc herniation at C5-6 on the right side. AR at 138.

From January 2, 2002 through July 30, 2002, Plaintiff primarily consulted with Dr. Erasmus, Dr. Dees, and Dr. Schiffer. AR at 138, 214. During this period, Plaintiff reported that his pain lessened while at rest, but he still experienced constant and severe pain in his neck and arms when active. AR at 222. He saw Dr. Erasmus every forty-five days, and visited Dr. Dees for chiropractic treatment three times a week starting on January 2, 2002. AR at 138, 221. On May 3, 2002, Dr. Dees stated that Plaintiff "should not be allowed to return to his previous capacity at work" because the nature of his job as a lather would aggravate Plaintiff's condition. AR at 243.

Dr. Schiffer performed cervical surgery on Plaintiff on July 30, 2002. AR at 211-12. After the surgery, Plaintiff underwent physical therapy three times a week. AR 179. On November 26, 2002, a report from his physical therapist to Dr. Schiffer states as follows:

> Terry Gamble has continued in physical therapy doing a strengthening program. He has supplemented this with a regular home program and has shown excellent strength gains within your weight lifting

3

>limitations. He is not having any pain and demonstrates good strength
>with all muscle groups though he does have mild [right] arm strength
>difference.

AR at 168. In a December 2, 2002 report, Dr. Schiffer stated that he had seen Plaintiff that day and that he "was doing great" other than slight residual hoarseness. AR at 201. On the same day, Dr. Schiffer referred Plaintiff for a work conditioning program, to occur three times a week for six weeks. AR at 203. At the hearing before the ALJ, Plaintiff testified that the work conditioning program "simulated" what he did in his job as a lather, which is a "very heavy lifting physical job." AR at 402. This program began with minor weight lifting and bicycle riding, and progressed to heavier weight lifting and lifting heavy objects onto different levels of platforms. AR at 403. Plaintiff used machines to work his arm and shoulder. *Id.* After each session, Plaintiff went home, applied ice to stiff muscles and lay down. AR at 404. Between sessions, he was very sore and took over-the-counter Motrin to reduce swelling. *Id.*

On January 6, 2003, Plaintiff complained to Dr. Schiffer that he was still experiencing occasional neck pain and headaches with overexertion, and Dr. Schiffer prescribed physical therapy with heat and light massage as needed. AR at 199. At this time, Dr. Schiffer projected that Plaintiff would return to work on January 20, 2003. *Id.*

On January 22, 2003, Plaintiff returned to full-time work as a lather. AR at 235-36. Plaintiff's job required him to lift 50-pound rolls of wire ten times a day and 100-pound bundles one to three times a day. AR at 197. Plaintiff still complained of intermittent pain in his right shoulder and neck which was aggravated in part by his work. AR at 197, 232. Plaintiff also testified that he suffered from headaches and found his work "very demanding . . . and very painful." AR at 405-06.

In a medical source statement dated February 27, 2003, Dr. Schiffer described Plaintiff's prognosis as "good," and stated that Plaintiff could frequently climb, balance, stoop, kneel, and crouch; that he could crawl occasionally; that his abilities as to handling, fingering, feeling, seeing, hearing, and speaking were unlimited; and that his ability to reach was limited on both the right and left sides. AR at 194. Dr. Schiffer also stated that Plaintiff could sit, stand, and/or walk with normal breaks for about six hours in an eight hour work day. AR at 193.

4

### C.  **Plaintiff's Second Injury**

On August 5, 2003, Plaintiff fell while at work and dislocated his left shoulder. AR at 291. As a result of this injury, Plaintiff stopped working; and there is no evidence in the record that Plaintiff has worked since this injury. A September 2, 2003 MRI scan showed partial thickness fraying in the supraspinatus tendon with no evidence of a full tear, as well as a "fairly large" cyst in the spinoglenoid notch. AR at 355. Another MRI taken on November 14, 2003, revealed a "tiny left paracentral disc protrustion" at C4-5. AR at 372.

On September 3, 2003, John Turns, M.D., treated Plaintiff for his shoulder injury. Dr. Turns diagnosed a rotator cuff injury and recommended an orthopaedic evaluation. AR at 359. Plaintiff was seen by Dr. Dev K. Mishra, an orthopaedic surgeon, on September 12, 2003. AR at 354. Plaintiff reported to Dr. Mishra that he "continue[d] to have very significant neck cramping, parascapular pain and muscle spasm." AR at 354. Dr. Mishra noted that this pain was "somewhat diffuse [in] nature and seem[ed] to be present at rest and accentuated somewhat by movement." AR at 354. In an effort to determine the source of this pain, Dr. Mishra "injected the left subacromial bursa with 10 cc of 1% plain Xylocaine." AR at 355. This injection did not alleviate Plaintiff's pain, leading Dr. Mishra to conclude that Plaintiff's pain was due an "extra-articular source." AR at 355. Dr. Mishra recommended that Plaintiff be considered "temporarily totally disabled until he obtain[ed] an opinion from [Dr. Schiffer]." AR at 355.

In a December 1, 2003 report to Plaintiff's Worker Compensation adjuster, Dr. Schiffer reported Plaintiff complained that his "total neck stiffness [had] increased and he note[d] a headache at the base of the posterior skull." AR at 291. Dr. Schiffer stated that he had reviewed Plaintiff's November 14, 2003 MRI and diagnosed a left C4-5 herniated nucleus pulposus. AR at 291. Dr. Schiffer recommended that Plaintiff undergo a one level cervical endoscopic discectomy to remove the herniated disc material. AR at 292. In this report, Dr. Schiffer stated that "surgical intervention is indicated" because Plaintiff had "not responded to conservative treatments" such as physical therapy and chiropractic treatment. *Id.*

Dr. Schiffer recommended this surgery again on March 22, 2004, when he noted that Plaintiff was still complaining of neck stiffness and headaches. AR at 287. According to Dr.

Schiffer, Plaintiff complained that all of his symptoms had become more severe since his last visit, on December 1, 2003, and that his headaches were more frequent. AR at 287.

A third letter from Dr. Schiffer to the Worker Compensation adjuster again requested authorization for surgery, noting that Plaintiff continued to complain of "total neck stiffness that is constant and severe and a headache at the base of the posterior skull that are very troublesome." AR at 284. However, authorization was apparently denied by Plaintiff's Worker Compensation adjuster.[1] *See* AR at 284.

Since his August 2003 injury, Plaintiff has undergone physical therapy and chiropractic treatment several times a week. AR at 287, 336, 363-67. On July 22, 2004, Dr. Dees wrote that Plaintiff reported increasing pain which was aggravated by many activities including lifting and prolonged sitting. AR at 327.

As a result of his second injury, Plaintiff also suffered from headaches. *See* AR at 284, 287, 308. In addition to the statements in Dr. Schiffer's reports, quoted above, on April 30, 2004, Plaintiff's physical therapist stated that Plaintiff suffered from "almost daily headaches." AR at 284, 308. Similarly, Plaintiff's chiropractor reported that Plaintiff was suffering from headaches. AR at 339, 342.

### D.  The Hearing

Earl J. Waits, Administrative Law Judge, presided over Plaintiff's hearing on September 14, 2004. Plaintiff, Plaintiff's father-in-law, and a Vocational Expert ("VE"), Gerald D. Belchick, Ph.D., testified at the hearing. Plaintiff described his injuries, surgery, and recovery. AR at 400-410. He testified that he stopped work on January 2, 2002, because of the pain and numbness in his right arm, and that before the July 2002 surgery he had to lie down "all the time" because of headaches, and stiffness and numbness in his right arm. AR at 400-01. Plaintiff described his work conditioning program, the headaches he experienced after his first injury, and his return to work in January 2003. AR at 402-05.

---

[1] There is no official explanation for the denial in the record. However, notes by Dr. Schiffer indicate the denial may have been based on the conclusion that the proposed surgery addressed medical problems that did not result from Plaintiff's second injury and, therefore, were not the responsibility of his employer. *See* AR at 384.

6

He also testified about his second injury, elaborating upon the pain resulting from that injury, such as stiffness, numbness, tingling and severe headaches. AR at 407-10. Plaintiff stated that after his second injury the headaches made him feel he could not "do anything . . . hear anything" or "see anything." AR at 408. Plaintiff testified that at the time of the hearing, the headaches had "decreased quite a bit," but still occurred "at least once a week," and sometimes forced him to lie down. *Id.* Plaintiff's father-in-law, Michael Henry, also testified that there were "many, many" times that Plaintiff had severe headaches. AR at 411. Plaintiff's father-in-law estimated that these headaches occurred three or four times a week. AR at 412. Mr. Henry stated that he saw his son-in-law "just about every day." AR at 411-12.

The VE, Dr. Belchick, testified about Plaintiff's ability to work. AR at 413-20. The ALJ asked Dr. Belchick to assume an individual whose ability to lift and carry was limited but who could easily sit, stand and walk. *Id.* The VE testified that such an individual could not work as a lather "at all," but could work as a door-to-door salesman or as a Cashier II. AR at 415. The VE estimated that there were numerous job openings as a cashier: 12,000 locally, and almost 200,000 nationally. *Id.* He stated that finding employment as a door-to-door salesman would be more difficult, but "there would be some" jobs available. AR at 416.

Plaintiff's attorney then questioned the VE. AR at 416-20. Plaintiff's attorney expanded upon the ALJ's hypothetical by adding the limitations of limited to occasional use of one arm and "difficulty with sustained forward flexion." AR at 416. The VE testified that if forward flexion was limited to one to two hours a day, that "pretty well" eliminated every possible job. AR at 417. The VE also stated that decreased use of one arm could "at times" affect Plaintiff's ability to work as a cashier. AR at 419. Additionally, Plaintiff's attorney added the limitations of "sustained" headaches and the need to lie down one to two hours a day to the hypothetical individual. AR at 419-20. The VE asserted such headaches could possibly affect that individual's ability to work, and that the need to lie down eliminated "all work." AR at 420.

### E.     The ALJ's Five-Step Analysis and Findings of Fact

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically

7

determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 980 (9th Cir.), *cert. denied*, 519 U.S. 881 (1996).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If he is, the Commissioner finds that the claimant is not disabled, and the evaluation stops. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and considers whether the claimant has "a severe medically determinable physical or mental impairment," or a combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 1520(c). If the claimant does not have a severe impairment, disability benefits are denied at this step. If it is determined that the impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments to a compiled listing of impairments that the Commissioner has ratified as disabling. 20 C.F.R. § 494.1520(a)(4)(iii). If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled. Otherwise, the Commissioner proceeds to Step Four and considers whether the claimant, in light of his impairments and residual functional capacity ("RFC") can still perform work he has performed in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still perform previous work, he is found not to be disabled. If the claimant cannot perform past relevant work, the Commissioner performs the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his

impairments, age, education, and work experience, can adjust to other work in the national economy. *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995). A claimant who is found able to make the adjustment to other work is not considered disabled, and will not receive disability benefits. 20 C.F.R. § 404.1520(f).

At Step One, the ALJ in this case found that Plaintiff had engaged in substantial gainful activity from January 21, 2003 until August 6, 2003.[2] AR at 35. The ALJ found that Plaintiff had not engaged in any substantial gainful activity between January 2, 2002, through January 20, 2003, or from August 6, 2003, to the date of the ALJ's decision, December 16, 2004. AR at 35, 41.

At Step Two, he found that Plaintiff suffered from cervical spondylosis and C5-6 disc protrusion, status-post C5-6 anterior cervical discectomy and recurrent disc protrusion at C4-5, and left shoulder dislocation and a left rotator cuff injury. AR at 39. The ALJ concluded that Plaintiff's combination of impairments was "severe." AR at 39.

At Step Three, the ALJ found that Plaintiff's impairments did not meet or equal any listed impairment which is considered conclusively disabling. AR at 39.

At Step Four, the ALJ considered Plaintiff's RFC. The ALJ found that within 12 months of Plaintiff's first injury, Plaintiff regained at least the ability to perform light work with no more than minimal overhead reaching bilaterally and occasional crawling. AR at 40. Plaintiff would also need to be able to alternate sitting and standing during the day to relieve pain and discomfort. AR at 40. The ALJ found that the Plaintiff had regained the same RFC within 12 months of his second injury. AR at 40.

The ALJ stated that he did not find Plaintiff's "theory of disability" persuasive. AR at 39. He thought it improbable that Plaintiff would transform "literally overnight" from being unable to do even sedentary work to being able to perform the medium-exertion job of lather on a full-time basis. *Id.* The ALJ concluded that the record pointed to a period of gradual improvement following

---

[2] It is unclear what evidence the ALJ relied on in concluding that Plaintiff returned to work on January 21, 2003. The record is inconsistent on this point, sometimes referring to Plaintiff's return-to-work date as January 23, 2003, *see, e.g.,* AR at 105, 127, and sometimes referring to it as January 22, 2003, *see* AR at 235. In other places, Plaintiff's doctors projected he would return to work on January 20, 2003. *See, e.g.,* AR at 236.

9

the July 2002 surgery. *Id.* At some point after this surgery, but within 12 months of the alleged onset date, the ALJ determined that Plaintiff had improved sufficiently to return to a limited range of light work activities. *Id.* He cited the evidence of substantial medical improvement set forth in Dr. Schiffer's progress notes and the physical therapy records as reasons to reject Plaintiff's theory. *Id.* The ALJ noted that he had "no reason" to reject Dr. Schiffer's February 27, 2003 medical source statement, which indicated that Plaintiff had regained the ability to perform light work activities, as well as Dr. Schiffer's description of Plaintiff's prognosis for recovery as "good." AR at 40. Further, the ALJ believed that the existence of the [Worker Compensation] litigation had "much to do with the prolongation of [Plaintiff's] symptoms." AR at 40.

The ALJ did not find the Plaintiff's allegations regarding his limitations "credible," and found that these claims were not supported by the evidence of record. AR at 40. He did not credit Plaintiff's testimony regarding Plaintiff's headaches because he claimed there were "no notations of headaches in the treating records, except in the chiropractic notes." AR at 39. The ALJ did not expressly reject the testimony of Plaintiff's father-in-law, but implicitly discredited it, stating that Plaintiff's father-in-law "confirmed that the claimant reports chronic headaches and complains that he cannot raise his right arm above his head, *although the injury was to his left arm*."[3] AR at 39 (emphasis added).

At Step Five, the ALJ, citing to the testimony of the VE, found that Plaintiff would be able to do his past job as a door-to-door salesman, an unskilled light job. *Id.* The ALJ noted, however, that the VE had testified there were few such jobs available in the national economy. *Id.* The ALJ concluded, nonetheless, that Plaintiff could perform other work that was available based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could do work as a Cashier II and that many such jobs existed in the national and local economy. *Id.*

Based on this testimony, the ALJ found that the Plaintiff was not disabled for the purposes of Title II of the Social Security Act. AR at 41.

---

[3] The ALJ is referring here, apparently, to the second injury. As the ALJ notes in his background section, Plaintiff's first injury resulted in "chronic neck pain, radiating to the *right* shoulder and down the right arm; right arm numbness; and tingling in the fingers of the right hand." AR at 37 (emphasis added).

10

**D.     The Motions**

The dispute in this case involves the ALJ's determinations of Plaintiff's RFC at Step Four and his ultimate conclusion at Step Five that there is work available in the national economy that Plaintiff can perform. Plaintiff cites a series of alleged errors on the part of the ALJ.

First, he asserts that the ALJ mistakenly failed to consider Plaintiff's necessary medical treatment, in particular, Plaintiff's demanding physical therapy schedule in the fall of 2002, when determining the RFC, even though the ALJ is required by statute to take treatment into account when analyzing RFC. *See* Social Security Ruling ("SSR") 96-98p.

Second, Plaintiff argues that the ALJ's reliance on the February 2003 assessment by Dr. Schiffer in support of his RFC was erroneous because that opinion bore no relationship to Plaintiff's RFC *prior* to returning to work, in January 2003 ("the Closed Period of Disability"), or *subsequent* to the additional injury sustained by Plaintiff in August 2003 ("the Open-Ended Period of Disability").[4]

Third, Plaintiff asserts that the ALJ improperly failed to credit Plaintiff's testimony regarding his pain, including his testimony about his headaches. In this regard, Plaintiff argues that the suggestion that the Worker Compensation litigation explained Plaintiff's complaints is not sufficient to satisfy the ALJ's burden. Plaintiff also challenges as incorrect the ALJ's assertion that there are "no notations of complaints of headaches in the treating records, except in the chiropractic notes," citing to several references to headaches in Dr. Schiffer's treating notes.

Fourth, Plaintiff argues that the ALJ improperly rejected the lay testimony of Plaintiff's father-in-law regarding Plaintiff's pain and headaches.

Fifth, Plaintiff argues that the ALJ erred in concluding at Step Five that Plaintiff could perform his past work as a door-to-door salesman given that the ALJ concluded Plaintiff could perform only light work. Plaintiff points to evidence in the record that the vacuum cleaners he formerly sold weighed 24 pounds, which exceeds the upper weight limit for light work.

---

[4] These are the terms used by the ALJ in his decision to refer to the period between the January 2, 2002 alleged onset date and Plaintiff's return to work in January 2003 (the Closed Period of Disability) and the period following Plaintiff's second injury, on August 6, 2003 (the Open-Ended Period of Disability).

1  The Commissioner argues that the ALJ determined the appropriate RFC by basing his
2  finding on the record as a whole. The Commissioner further contends that the ALJ properly
3  evaluated the Plaintiff's credibility by providing clear and specific reasons for rejecting the
4  Plaintiff's claims and Plaintiff's father-in-law's testimony.  Finally, the Commissioner argues that
5  the ALJ properly found that Plaintiff could return to work, even if Plaintiff cannot work as a door-
6  to-door salesman.

## III.  ANALYSIS

### A.  Legal Standard

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner that are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1985).  Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when weighing the evidence and in reaching a decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).  In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

### B.  The ALJ's Consideration of Plaintiff's Treatment

Plaintiff contends that the ALJ did not correctly follow its own rules requiring the ALJ to take into account limitations imposed by treatment, including the demands of physical therapy, in determining Plaintiff's RFC. *See* Social Security Ruling ("SSR") 96-98p.  The Court disagrees.

SSR 96-8p states that, "[t]he RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment."  Throughout his opinion, the ALJ explicitly refers to Plaintiff's various treatments, including physical therapy, visits to the doctor and chiropractic treatment.  *See* AR at 38-40.  The ALJ directly questioned Plaintiff on the impact of his treatment and analyzed

12

evidence of Plaintiff's success in treatment when determining Plaintiff's RFC. AR at 39. For example, the ALJ directly cited to Plaintiff's physical therapy records and Dr. Schiffer's progress notes when establishing Plaintiff's RFC. AR at 39. The ALJ does not need to recite "magic words" for his finding to be legitimate. *Magellanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989). The Court can draw reasonable inferences from the ALJ's opinion. *Id.* Here, the record shows that the ALJ adequately considered Plaintiff's treatment when determining Plaintiff's RFC, as required by the Commissioner's regulations.

### C.   The ALJ's Reliance on Dr. Schiffer's February 2003 Medical Source Statement

Plaintiff asserts that the ALJ erred in relying on Dr. Schiffer's February 2003 assessment of his ability to work because that opinion had little evidentiary of value for determining Plaintiff's RFC *prior* to his return to work, during the Closed Period of Disability, or *subsequent* to Plaintiff's second injury. The Court concludes that the ALJ's reliance on Dr. Schiffer's opinion was reasonable as to the Closed Period of Disability but that the ALJ erred in relying on that opinion as to the Open-Ended Period of Disability.

With respect to the Closed Period of Disability, the ALJ reasoned that Plaintiff experienced a "period of gradual improvement" following his surgery in July 2002 such that he attained a limited ability to perform light work sometime before January 2, 2003, that is, 12 months from the alleged onset date of January 2, 2002. This conclusion is based on the fact that Plaintiff returned to a *medium* exertion job just a few weeks later. The ALJ also cited to "Dr. Schiffer's progress notes and physical therapy records," as well as the February 2003 assessment. As described above, the progress notes and physical therapy records show that Plaintiff was recovering well during the fall of 2002 – well enough, in fact, to undergo a demanding work conditioning program in December 2002. While the discomfort experienced by Plaintiff as a result of this program indicates he was not yet ready for the medium work he was preparing to return to, the ALJ could rationally conclude that these records showed an ability to perform light work sometime before Plaintiff returned to work. The ALJ's reliance, in part, on Dr. Schiffer's February 2003 opinion also is not unreasonable, given that Dr. Schiffer had last seen Plaintiff during the Closed Period of Disability, on January 6, 2003. *See* AR at 194. In addition, the ALJ adjusted the RFC to reflect more limited abilities than Dr.

Schiffer had indicated in his February assessment, thus adequately taking into consideration the fact that Dr. Schiffer completed that form after Plaintiff had returned to work.

On the other hand, the ALJ erred in relying on Dr. Schiffer's opinion with respect to Plaintiff's RFC for the Open-Ended Period of Disability, which the Court concludes is not supported by substantial evidence. The ALJ concluded that Plaintiff's RFC after his second injury was the same as it was before that injury. The ALJ did not offer any additional reasoning beyond that already offered in support of the RFC for the Closed Period of Disability. The ALJ did not explain why this assessment continued to be applicable for the later period, given that Dr. Schiffer had diagnosed Plaintiff with a new condition following the second injury and noted in numerous reports that Plaintiff's condition had worsened in a number of respects, including increased neck stiffness, severe headaches, and "severe tenderness of the posterior left shoulder." *See* AR at 291, 287 and 284. During this period, in fact, Dr. Schiffer was recommending additional surgery, based on his review of an MRI done in November 2003 that Dr. Schiffer concluded reflected a "left C4-5 herniated nucleus pulposis with granulation tissue on the right at C5-6." AR at 291.

Because Dr. Schiffer was Plaintiff's treating physician, as acknowledged by the ALJ, *see* AR at 38, the ALJ could only reject his opinion if he made "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Yet, as noted above, the ALJ provides no explanation for his implicit rejection of Dr. Schiffer's later opinions, expressed concurrent with the Open-Ended Period of Disability, in favor the February 2003 assessment by Dr. Schiffer made prior to Plaintiff's second injury. The Court concludes that the ALJ erred in relying on Dr. Schiffer's earlier opinions without providing any explanation for his rejection of later opinions that appear to modify the earlier assessment. As a result, the RFC for the Open-Ended Period of Disability is not supported by substantial evidence.

### D. Rejection of Plaintiff's Pain Testimony

In developing a claimant's RFC, the ALJ must consider limitations imposed by all of the claimant's impairments. SSR 96-8p. The ALJ must also consider "the impact of any related symptoms, including pain," when establishing the RFC. 20 C.F.R. § 404.1545; *see also* 20 C.F.R.

14

§ 404.1529(c)(4) (addressing how pain is assessed in determining ability to work). If a plaintiff produces medical evidence of underlying impairments consistent with his complaints and there is no affirmative evidence that he is malingering, the ALJ's reasons for rejecting the testimony must be clear and convincing. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). Social Security Regulations state that "the finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility," but must be grounded in the evidence and articulated in the ALJ's decision. SSR 96-7p; *see also Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988), rev'd on other grounds upon reh'g, 859 F.2d 1396 (9th Cir. 1988).

Here, Plaintiff has medical evidence that he suffered from pain and headaches as a result of his two injuries to his neck and back and the ALJ has pointed to no affirmative evidence of malingering. Therefore, his pain testimony must be credited unless the ALJ has articulated clear and convincing reasons for rejecting that testimony. As to the Closed Period of Disability, the Court concludes the ALJ met this standard by citing to evidence that Plaintiff's doctor and physical therapist believed that Plaintiff was doing very well in the fall of 2002, that Plaintiff was able to undergo a demanding work conditioning program in December of that year, and that he returned to his medium-exertion work in January 2003.

In contrast, the ALJ has not provided clear and convincing reasons for rejecting Plaintiff's pain testimony for the Open-Ended Period of Disability. As to that period, the only reason offered by the ALJ for rejecting Plaintiff's testimony was the pending Worker Compensation claim. Yet everyone who treated Plaintiff noted that Plaintiff was experiencing increased pain and headaches following his second injury.[5] These reports were supported by MRI's showing a condition that Plaintiff's treating physician believed was causing the pain and which required surgery. While authorization for that surgery was denied, there is no evidence in the record that the denial was for medical reasons. Rather, the limited evidence in the record indicates that the denial was for non-

---

[5] The ALJ appears to have been unaware of the numerous reports following Plaintiff's second injury regarding headaches, incorrectly stating that there were "no notations of headaches in the treating records, except in the chiropractic notes." AR at 39.

15

1 medical reasons. Further, Plaintiff was receiving physical therapy and treatment from his
2 chiropractor on a frequent and regular basis throughout this period. In light of this evidence, the fact
3 that Plaintiff was seeking authorization for surgery recommended by his treating physician does not
4 constitute a clear and convincing reason for rejecting Plaintiff's testimony.

### E.     Rejection of Lay Testimony

Plaintiff asserts that the ALJ erred in rejecting the lay testimony of his father-in-law regarding his pain. The Court agrees.

In the Ninth Circuit, it is established that an ALJ "need not discuss *all* evidence presented," but rather must explain only why "significant probative evidence has been rejected." *Vincent v. Heckler*, 739 F.2d 1393. In *Vincent*, the court affirmed the decision of the ALJ, even though he did not discuss in his decision lay testimony about the claimant's impairments, because the court found that the ALJ's findings were supported by medical evidence that contradicted the lay testimony. *Id*. In a subsequent decision, the Ninth Circuit explained that in *Vincent*, the ALJ was not required to provide reasons for disregarding the lay testimony because the lay witness purported to make a medical *diagnosis* – something lay witnesses are not competent to testify about – and, therefore, the evidence was not "probative." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

In contrast, lay witnesses *are* competent to testify about how a claimant's symptoms affect his ability to work. *Id*. For example, in *Nguyen*, the court held that the ALJ erred when he failed to consider testimony by both the claimant and his wife that the claimant had a serious coughing problem. *Id*. Consequently, the ALJ did not include in his hypothetical to the vocational expert a limitation reflecting this symptom. *Id*. The court held that the ALJ could only reject the testimony of the lay witness (the claimant's wife) if he gave reasons that were "germane" to that witness. *Id*. (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)). The court further held that because the ALJ did not include the coughing limitation in the hypothetical to the vocational expert, the conclusion that there was work available in the national economy that the claimant could perform was not supported by substantial evidence. *Id*.

Here, as in *Nguyen*, Plaintiff offered probative lay testimony regarding the impact of Plaintiff's symptoms on his ability to work. In particular, he offered the testimony of his father-in-

16

law, who sees Plaintiff on a daily basis, that Plaintiff has difficulty raising his right arm over his head and that he frequently needs to lie down because of his headaches. The ALJ did not give any reason for rejecting this testimony, although he noted elsewhere in the decision – incorrectly – that there were no notations of headaches in the medical records other than those of the chiropractor. The ALJ did imply that he might not have believed the father-in-law's testimony because that testimony referred to Plaintiff's right arm whereas Plaintiff's second injury was to his left arm. *See* AR 39 (stating that Plaintiff's father-in-law "confirmed that the claimant reports chronic headaches and complains that he cannot raise his right arm above his head, although the injury was to his left arm"). To the extent this was the ALJ's reason for rejecting this testimony, it is not supported by substantial evidence, given that Plaintiff also had a long history of problems with his right arm resulting from his *first* injury. Morever, even if this reason were adequate to reject the testimony regarding Plaintiff's ability to raise his right arm, it is not germane to the testimony concerning Plaintiff's headaches and his need to lie down. Therefore, the ALJ failed to meet the standard articulated in *Nguyen*.

### F. Determination at Step Five Regarding Available Work

Plaintiff asserts that the Commissioner's conclusion at Step Five, that there was work available that he could perform in the national economy, is not supported by substantial evidence because: 1) the finding that Plaintiff could perform his past work as a door-to-door salesman is not consistent with the evidence he presented showing the weight of the vacuum cleaners he used to sell exceeds the weight limitation for light work; and 2) the ALJ failed to adequately consider Plaintiff's pain in his RFC, for the reasons stated above, and therefore, did not include all of Plaintiff's limitations in his hypotheticals to the VE.

The Court rejects Plaintiff's first argument because the ALJ's conclusion at Step Five was not based on Plaintiff's ability to work as a door-to-door salesman. Rather, the ALJ expressly cited the VE's evidence that there were few such jobs in the national economy, stating that *despite* this evidence, the Commissioner's burden was met by evidence that Plaintiff could perform "other work." AR at 40. The ALJ went on to cite evidence that Plaintiff could work as a Cashier II and that there were 12,000 such jobs in the local economy. AR at 40.

With respect to Plaintiff's RFC, the Court concludes, for the reasons stated above, that the ALJ did not err as to the Closed Period of Disability and therefore, his determination at Step Five was supported by substantial evidence. On the other hand, also for the reasons stated above, the ALJ's erred with respect to Plaintiff's RFC for the Open-Ended Period of Disability by ignoring the reports of Plaintiff's treating physician without providing adequate explanation, discrediting Plaintiff's pain testimony, and failing to address lay testimony regarding Plaintiff's pain. As a result, the ALJ's finding at Step Five is not supported by substantial evidence for this period.

## IV. CONCLUSION

Based on its review of the pleadings and administrative record, a court may affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). Absent rare circumstances, the proper course is to remand to the Commissioner for additional investigation or explanation. *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). Accordingly, the Court affirms the decision of the ALJ as to the Closed Period of Disability, reverses the decision of the ALJ as to the Open-Ended Period of Disability, and remands to the Commissioner for further proceedings.

On remand, the ALJ is instructed to reevaluate Plaintiff's RFC for the Open-Ended Period of Disability. In doing so, he should address the pain testimony of Plaintiff, the lay testimony of Plaintiff's father-in-law, and the opinions of Dr. Schiffer as they relate to Plaintiff's limitations *after* his second injury. Should he determine that Plaintiff's RFC must be revised to include additional limitations, he shall proceed to Step Five to reevaluate whether, in light of the revised RFC, Plaintiff can perform any jobs that are available in significant number in the national economy.

IT IS SO ORDERED.

Dated: September 15, 2006

JOSEPH C. SPERO
United States Magistrate Judge